CRESTAR BANK, N.A., Appellant,

v.

Eric L. CHEEVERS, Appellee.

No. 97–CV–1584.

District of Columbia Court of Appeals.

Argued March 9, 1999.
Decided Feb. 3, 2000.

---

Ronald M. Abramson, with whom Ronald S. Canter, Bethesda, MD, was on the brief, for appellant.

John Keitt Hane, III, Washington, DC, for appellee.

Before WAGNER, Chief Judge, and SCHWELB and REID, Associate Judges.

REID, Associate Judge.

The central issue presented in this case is whether, under the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.* (1994), a credit cardholder is required to avail himself of the billing dispute procedures of 15 U.S.C. § 1666 by notifying the creditor of disputed charges, in order to invoke the liability protections of 15 U.S.C. § 1643 against unauthorized charges to a credit card. Appellant Crestar Bank

("Crestar") filed a civil action against appellee Eric L. Cheevers alleging that Mr. Cheevers owed an outstanding credit card balance of $4,231.76, plus interest. Mr. Cheevers claimed that he did not make or authorize most of the charges alleged. The trial court concluded that the disputed charges were "unauthorized" within the meaning of 15 U.S.C. § 1643, and thus, Mr. Cheevers was not liable for them. We affirm, concluding that § 1666 imposes no mandatory notification requirement on the credit cardholder, and that Crestar failed to satisfy its burden of proof under § 1643 by showing that the charges on Mr. Cheevers' credit card were authorized, or that if unauthorized, the statutory conditions imposed on Crestar were not met.

## FACTUAL SUMMARY

The evidence at trial established that on April 3, 1992, Mr. Cheevers entered into an agreement with Crestar for use of a Visa credit card. At the time, he resided in the 1600 block of Kenyon Street, N.W., but notified Crestar in December 1992 of his move to another address. Crestar received regular and timely payments from Mr. Cheevers from April 1992 until December 1993. Mr. Cheevers made additional charges on his account in January, February and April 1994. After his April 1994 charge, he took the credit card out of his wallet to avoid further use because he was experiencing financial difficulties. He could not recall what he did with the card, but thought it may have been lost during his move from Kenyon Street.

When Mr. Cheevers' account became two months past due in June 1994, Crestar blocked the account from further transactions and mailed Mr. Cheevers a statement informing him that his privileges had been suspended. Despite the block on Mr. Cheevers' account, in October and November, 1994, charges totaling $3,583.92 were posted to Mr. Cheevers' card from Amtrak automated ticket machines.

In August 1994, Mr. Cheevers moved again and filled out a postal forwarding address card. On November 29, 1994, Crestar sent Mr. Cheevers a billing statement which included the charges from October and November. Mr. Cheevers testified that he never received the statement. Crestar's litigation department also sent a letter to Mr. Cheevers, but the letter was returned by the postal service to Crestar on December 14, 1994. At that time, Crestar charged the matter off as bad debt, turned it over to its attorneys, and stopped mailing monthly statements to Mr. Cheevers.

Sometime around November 1994, Crestar contacted the Amtrak Police Department about the charges on Mr. Cheevers' credit card. Raymond E. Wright, then a criminal investigator with the Amtrak Police, investigated the matter. He testified that the machines used to purchase the Amtrak tickets required no signature nor other identifying information, and took no photograph of the purchaser. He stated that the transactions amounting to thousands of dollars on Mr. Cheevers's card were unusual. He concluded that the ticket transactions were irregular and fraudulent.

In the early part of 1995, Crestar continued its efforts to collect from Mr. Cheevers the sums charged to his account. On March 8, 1995, an entry made by the Crestar collector assigned to the account stated: "This is probably fraud, no idea, real mess." On March 22, 1995, Crestar's attorneys called Mr. Cheevers and left a message on his machine. When they called back on April 8, 1995, the number was disconnected. On April 26, 1995, the attorneys contacted Mr. Cheevers' place of employment but were informed that he had been fired. On May 2, 1995, Crestar filed suit against Mr. Cheevers.

Mr. Cheevers testified that after changing jobs in April 1995, which resulted in his making more money, he contacted Crestar on July 24, 1995, without knowledge either of the October and November charges on his credit card or the lawsuit

**1046**

against him, because he wanted to pay off his balance which he believed was about $400. When the Crestar representative told him that the balance was about $4,500, Mr. Cheevers "became very alarmed and asked her why the amount was so high." The Crestar representative stated that fraud was suspected and suggested that he call Amtrak and Crestar's attorneys. Mr. Cheevers called Officer Wright and the attorneys. Subsequently, in January 1996, he notified Crestar, the bank's attorneys, and the Amtrak Police in writing that he disputed the October and November 1994 charges. He testified that he did not make the Amtrak charges, that he did not receive any benefit from the charges, that neither he nor his family traveled during that period of time, that he did not give tickets to anyone, and that he does not know who made the charges.

After the bench trial, the trial court ruled "for Mr. Cheevers as to all of the matters in dispute" and in favor of the bank for the undisputed amount of $617.84, plus prejudgment interest from September 1994. In particular, the court concluded that Crestar had failed to carry its burden of proof to show that the charges made on Mr. Cheevers' credit card were authorized,[1] and that Mr. Cheevers could not be assessed the statutory $50 fee "because the bank ha[d] not provided a method whereby the use[r] of the card can be identified as the person authorized to use it with respect to the charges that were incurred." Relying on *Stieger*,[2] the trial court also determined that TILA precluded "a finding of apparent authority where the transfer of the card was without the cardholder's consent as in cases involving theft, loss or fraud."

**1.** More specifically, the court stated:
I just think that this case turns on the burden of proof and the bank didn't know who was fooling around with this card, Union Station, Amtrak after investigating it couldn't figure out who was involved in the unauthorized use of this card. Looking at the statements for October and November,

## ANALYSIS

Crestar cites 15 U.S.C. § 1666, known as the Fair Credit Billing Act ("FCBA"), and contends that the trial court erred by ruling that Mr. Cheevers was not liable for the disputed charges on his credit card, and that § 1666 obligated him to notify Crestar, in writing, within sixty (60) days of receipt of the billing statement that the October and November 1994 charges were unauthorized. Moreover, Crestar argues, Mr. Cheevers had a contractual and common law duty to notify the bank that his credit card had been lost or stolen. In response, Mr. Cheevers argues that § 1666 does not bar him from raising an unauthorized charge defense under 15 U.S.C. § 1643 of TILA, and that Crestar failed to sustain its burden of proof under § 1643, the credit agreement and the common law, to show that the disputed charges were authorized.

At the outset of this opinion, we set forth certain principles that guide our decision. We recognize that: "The Truth–In–Lending Act was enacted 'in large measure to protect credit cardholders from unauthorized use perpetrated by those able to obtain possession of a card from its original owner.'" *Stieger, supra* note 2, 666 A.2d at 482 (quoting *Towers World Airways Inc. v. PHH Aviation Sys., Inc.*, 933 F.2d 174, 176 (2nd Cir.), *cert. denied*, 502 U.S. 823, 112 S.Ct. 87, 116 L.Ed.2d 59 (1991)). Moreover, "[TILA] is to be liberally construed in favor of the consumer." *Martin v. American Express, Inc.*, 361 So.2d 597, 600 (Ala.Civ.App.1978). In keeping with Congress' intent to protect cardholders, § 1643(b) of TILA places the burden of proof on the card issuer, in this case Crestar bank, to show that the disput-

there's really nothing that quite jumps out that makes it plain that it must have been Mr. Cheevers who was running up these charges and then selling the tickets on the street to get some money.

**2.** *Stieger v. Chevy Chase Sav. Bank, F.S.B.*, 666 A.2d 479 (D.C.1995).

ed charges were authorized: "In any action by a card issuer to enforce liability for the use of a credit card, the burden of proof is upon the card issuer to show that the use was authorized ...." If certain statutory conditions are met, the limit of liability for unauthorized charges is $50 under § 1643(a)(1)(B). "However, [TILA] does not limit liability for the cardholder for third party charges made with 'actual, implied or apparent authority .'" *Stieger, supra* note 2, 666 A.2d at 482 (quoting 15 U.S.C.A. § 1602(*o*)). While § 1666 of the FCBA refers to a sixty day notice to the bank of a billing error and the steps the bank must take if a cardholder notifies it of a billing error, notice of such billing error by the cardholder is not required to trigger the protections of § 1643. *See* Regulation Z, 12 C.F.R. pt. 226, Supp. I, at 354 (1999). Indeed, "the legislative history of ... [the FCBA] shows that it amended [TILA] for the purpose of protecting the consumer against 'unfair and inaccurate credit billing and credit card practices.'" *Jacobs v. Marine Midland Bank, N.A.,* 124 Misc.2d 162, 475 N.Y.S.2d 1003, 1005 (N.Y.Sup.Ct.1984); *see also Saunders v. Ameritrust of Cincinnati,* 587 F.Supp. 896, 898 (S.D.Ohio 1984) ("Section 1666 sets out the mechanisms by which an obligor is to notify a creditor of a billing error, and the steps a creditor must take once it receives notice of a billing error.").

■ We turn first to Crestar's argument that: "In its simplest form, 15 U.S.C. § 1666 (1998) requires cardholders to in-form card issuers of any errors on their statements, in writing, within sixty (60) days of the receipt of the statement." Crestar seeks to impose a notification requirement on Mr. Cheevers that does not exist either under the plain words of § 1666 or its legislative history. Rather, § 1666 requires the bank or a creditor to take certain action after the cardholder notifies it of a billing error.[3] Thus, § 1666 recognizes that a cardholder may inform the bank of a billing error, but does not mandate such notification. *See Gray v. American Express Co.,* 240 U.S.App. D.C. 10, 13, 743 F.2d 10, 13 (1984) ("'If the [cardholder] believes that the [billing] statement contains a billing error ..., he then may send the creditor a written notice setting forth that belief, indicating the amount of the error and the reasons supporting his belief that it is an error.'") (quoting *American Express Co. v. Koerner,* 452 U.S. 233, 235–36, 101 S.Ct. 2281, 68 L.Ed.2d 803 (1981)). In addition, § 1666 imposes on the card issuer or the bank an obligation to acknowledge and investigate the alleged billing error. *Id.*

■ This reading of the statute is consistent with the legislative history of § 1666 which reveals Congress' intent to protect the consumer against the creditor's unfair and inaccurate billing practices. Moreover, it is consistent with Federal Reserve Board staff interpretation of the unauthorized use provision of § 1643 and the billing error provision of § 1666 of

---

3. Section 1666 provides in pertinent part:

  (a) ... If a creditor, within sixty days after having transmitted to an obligor a statement of the obligor's account in connection with an extension of consumer credit, receives at the address disclosed under section 1637(b)(10) of this title a written notice ... from the obligor in which the obligor—

    ...

    (2) indicates the obligor's belief that the statement contains a billing error and the amount of such billing error, and

    (3) ... the creditor shall, unless the obligor has, after giving such written notice ..., agreed that the statement was correct—

    (A) not later than thirty days after the receipt of the notice, send a written acknowledgement thereof to the obligor ..., and

    (B) not later than two complete billing cycles of the creditor ... after the receipt of the notice and prior to taking any action to collect the amount ... either—

    (i) make appropriate corrections in the account of the obligor ...; or

    (ii) send a written explanation or clarification to the obligor, after having conducted an investigation ....

Regulation Z, 12 C.F.R. pts. 226.12 and 226.13, regulations promulgated by the Board of Governors of the Federal Reserve System to implement TILA. In interpreting the notice to card issuer provision, the staff of the Board stated:

> Notice of loss, theft, or possible unauthorized use need not be initiated by the cardholder....
>
> The liability protections afforded to cardholders in § 226.12 do not depend upon the cardholder's following the error resolution procedures in § 226.13. For example, the written notification and time limit requirements of § 226.13 do not affect the § 226.12 protections.

12 C.F.R. pt. 226, Supp. I, at 354. Courts must give deference to agency interpretations of TILA and its implementing regulations. *See Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981) ("[A]bsent some obvious repugnance to [TILA], the Board's regulation implementing this legislation should be accepted by the courts, as should the Board's interpretation of its own regulation."); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980) ("[D]eference is especially appropriate in the process of interpreting the Truth in Lending Act and Regulation Z."). Consequently, we conclude that § 1666 imposed no requirement on Mr. Cheevers to notify Crestar of a billing error before he could invoke the protections of § 1643. We turn now to § 1643.

■■■ Crestar maintains that Mr. Cheevers' "failure to object to the [disput-ed] charges within a reasonable time, even if not his, constituted ratification and acceptance of those charges," and that under contractual and common law, "if the cardholder fails to notify the bank of any dispute within a reasonable period, he is deemed to have admitted the authenticity of the charges." In essence, Crestar reads into § 1643 a presumption that if the cardholder fails to notify the bank that the disputed charges are not his, they will be deemed to have been authorized by the cardholder. This presumption is at odds with the plain words of § 1643 which impose on the bank the burden to show authorized use of the card, or liability of the cardholder for unauthorized use. As the trial court concluded, nothing in the record demonstrated that Mr. Cheevers authorized the charges on his credit card in November and December 1994.[4] In fact, he emphatically denied authorizing the purchase of any Amtrak tickets on his credit card. Nor was there any evidence in the record that Mr. Cheevers voluntarily transferred his card to a third person. "'[TILA] clearly precludes a finding of apparent authority where the transfer of the card was without the cardholder's consent as in cases involving theft, loss, or fraud.'" *Stieger, supra* note 2, 666 A.2d at 482 (quoting *Towers World Airways Inc.*, 933 F.2d at 177). Similarly, the record in this case provided no support for the proposition that Mr. Cheevers transferred his card to a third person who had apparent authority to charge the Amtrak tickets. Therefore, we agree with the trial court that Crestar failed to carry its bur-

---

4. This case differs from *Minskoff v. American Express Travel Servs.*, 98 F.3d 703 (2d Cir. 1996) on which Crestar relies. In that case, the corporate assistant to the president of the corporation that the bank sued made the fraudulent charges, and the court determined that the president was liable for charges made after the bank sent a statement showing the initial unauthorized charges. In addition, sums reflected in the monthly billing statements, including the disputed charges, were paid in full for sixteen consecutive months prior to notification that the charges were unauthorized. In contrast, in the case before us, there is no showing that Mr. Cheevers had any relationship with the person who charged the Amtrak tickets to his credit card, and Mr. Cheevers never paid the disputed charges. Neither *Exxon Corp. v. International Concrete Corp.*, 335 A.2d 236 (D.C.1975), nor *Thomas v. Central Charge Serv., Inc.*, 212 A.2d 533 (D.C.1965), cited by Crestar, involved TILA; furthermore, nothing in either of these cases supports Crestar's argument that Mr. Cheevers should be liable for unauthorized charges on his credit card.

den of proof to show that the disputed charges were authorized.

■ The only other way Crestar could prevail under § 1643(a) [5] is to show that the conditions of liability for unauthorized use of Mr. Cheevers' card have been met: "[I]f the use was unauthorized, then the burden of proof is upon the card issuer to show that the conditions of liability for the unauthorized use of a credit card ... have been met." 15 U.S.C. § 1643(b). Six statutory conditions are imposed upon the card issuer or the bank. See note 5, *supra*. We agree with the trial court that Crestar did not satisfy at least one of these conditions, § 1643(a)(1)(F): "The card issuer has provided a method whereby the user of such card can be identified as the person authorized to use it." Mr. Wright, the Amtrak Police criminal investigator in this matter, testified that the machines used to purchase the Amtrak tickets required no signature, took no photograph of the purchaser, and did not identify the purchaser by any other means. In fact, it was impossible to determine who had used Mr. Cheevers' credit card to purchase the Amtrak tickets. Consequently, no evidence was introduced at trial to show that Crestar "provided a method whereby the user of [Mr. Cheevers'] card can be identified as the person authorized to use it," and thus, Crestar did not sustain its burden to show that it met the conditions for Mr. Cheevers' liability for unauthorized use of his credit card.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

---

5. Section 1643(a) provides:

(1) A cardholder shall be liable for the unauthorized use of a credit card only if—

(A) the card is an accepted credit card; ·

(B) the liability is not in excess of $50;

(C) the card issuer gives adequate notice to the cardholder of the potential liability;

(D) the card issuer has provided the cardholder with a description of a means by which the card issuer may be notified of loss or theft of the card, which description may be provided on the face or reverse side of the statement required by section 1637(b) of this title or on a separate notice accompanying such statement;

(E) the unauthorized use occurs before the card issuer has been notified that an unauthorized use of the credit card has occurred or may occur as the result of loss, theft, or otherwise; and

(F) the card issuer has provided a method whereby the user of such card can be identified as the person authorized to use it.

(2) For purposes of this section, a card issuer has been notified when such steps as may be reasonably required in the ordinary course of business to provide the card issuer with the pertinent information have been taken, whether or not any particular officer, employee, or agent of the card issuer does, in fact receive such information.