PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 09-1553

———

FRANCIS H. AZUR,
Appellant

v.

CHASE BANK, USA, NATIONAL ASSOCIATION
formerly known as CHASE MANHATTAN BANK, USA,
NATIONAL ASSOCIATION formerly known as
FIRST USA BANK, N.A.

———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-06-cv-01088)
District Judge:  Honorable Donetta W. Ambrose

———

Argued January 27, 2010
Before:  FUENTES and FISHER, *Circuit Judges*,
and DIAMOND,* *District Judge*.

———

*Honorable  Paul  S.  Diamond,  United  States  District
Judge  for  the  Eastern  District  of  Pennsylvania,  sitting  by

(Filed: April 1, 2010)

Dennis J. Buffone
Kurt A. Miller
Jerri A. Ryan (Argued)
Ilene Tobias
Thorp, Reed & Armstrong
301 Grant Street
One Oxford Centre, 14th Floor
Pittsburgh,  PA 15219
     *Counsel for Appellant*

James C. Martin (Argued)
Perry A. Napolitano
Reed Smith
225 Fifth Avenue
Pittsburgh, PA  15222

Joe N. Nguyen
Reed Smith
1650 Market Street
2500 One Liberty Place
Philadelphia, PA  19103-7301

Felicia Y. Yu
Reed Smith
355 South Grand Avenue, Suite 2900
Los Angeles, CA  90071

---

designation.

*Counsel for Appellee*

---

## OPINION OF THE COURT

---

FISHER, *Circuit Judge*.

Francis H. Azur filed suit against Chase Bank, USA, alleging violations of 15 U.S.C. §§ 1643 and 1666 of the Truth in Lending Act (TILA) and a common law negligence claim after Azur's personal assistant, Michele Vanek, misappropriated over $1 million from Azur through the fraudulent use of a Chase credit card over the course of seven years. The District Court granted Chase's motion for summary judgment, and Azur appealed. We are presented here with three discrete issues for our review. First, we must determine whether § 1643 of the TILA provides the cardholder with a right to reimbursement. Second, we must evaluate whether Azur's §§ 1643 and 1666 claims are precluded because Azur vested Vanek with apparent authority to use the Chase credit card. Third and finally, we must decide whether Azur's negligence claim is barred by Pennsylvania's "economic loss doctrine." For the reasons stated herein, we will affirm, on partly different grounds, the District Court's order granting Chase's motion for summary judgment.

**I.**

**A.**

3

ATM Corporation of America, Inc. (ATM) manages settlement services for large national lenders. Azur, the founder of ATM, served as its president and chief executive officer from 1993 until September 2007, when ATM was sold. In July 1997, ATM hired Vanek to be Azur's personal assistant. Vanek's responsibilities consisted of picking up Azur's personal bills, including his credit card bills, from a Post Office Box in Coraopolis, Pennsylvania;[1] opening the bills; preparing and presenting checks for Azur to sign; mailing the payments; and balancing Azur's checking and savings accounts at Dollar Bank. According to Azur, it was Vanek's job alone to review Azur's credit card and bank statements and contact the credit card company to discuss any odd charges. Azur also provided Vanek with access to his credit card number to enable her to make purchases at his request.

From around November 1999 to March 2006, Vanek withdrew without authorization cash advances of between $200 and $700, typically twice a day, from a Chase credit card account in Azur's name.[2] Azur was the sole cardholder and only authorized user on the account. Although Azur recalls opening

---

[1]Azur had never been to the P.O. Box and did not have a key to it.

[2]When the misappropriation began in 1999, the account was at First USA Bank, National Association (First USA), Chase's predecessor. In April 2003, First USA became Bank One, Delaware, National Association (Bank One); in February 2006, Bank One merged with Chase.

a credit card account in or around 1987 with First USA, Chase's predecessor,[3] Azur was unaware that he had a Chase credit card.

Each fraudulent transaction included a fee of approximately $2.00 and a finance charge that corresponded to the amount withdrawn, ranging from $4.00 for a $100 advance, to $21.06 for a $700 advance. The fraudulent charges were reflected on at least 65 monthly billing statements sent by Chase to Azur, and Vanek paid the bills by either writing checks or making on-line payments from Azur's Dollar Bank checking account. When writing checks, Vanek forged Azur's signature. Over the course of seven years, Vanek misappropriated over $1 million from Azur.

The transactions occasionally triggered Chase's fraud strategies.[4] On April 16, 2004, Chase detected its first potentially fraudulent transaction, made outbound calls to the

---

[3]Chase has possession of a letter dated July 20, 1999, and signed by Azur that authorizes First USA to "discuss and/or release information with my assistant Michelle Vanek." (App. at 1443A.)

[4]Chase employed a computerized fraud detection system known as FALCON, which Chase claimed was the best fraud detection tool in the industry. In addition to FALCON, Chase reviewed authorizations in real time and employed other authorization controls, including placing limitations on the number of ATM transactions completed in a day and on the dollar amounts of withdrawals.

account's home telephone number, and left an automated message on the number's answering machine. Chase received no response. On April 23, 2004, one week later, Chase detected a second potential problem and left another automated message at the same telephone number. Three days later, Chase received a call from someone that was able to verify the account's security questions and validate the card activity. Although Chase's records indicate that the caller was female, Chase did not use voice recognition or gender identification as a means of security verification. Finally, on May 14, 2005, approximately one year later, Chase detected a third potentially fraudulent transaction and called the home telephone number. As before, five days later, a return caller once again verified the account activity. The account was paid in full without protest after each incident.[5]

On or about March 7, 2006, Azur discovered a suspicious letter requesting a transfer of funds from his checking account. After investigating, Azur and ATM discovered Vanek's fraudulent scheme and terminated her employment. On March 8, 2006, Azur notified Chase by telephone of the fraudulent use of the Chase account and closed the account. Thereafter, Azur sent Chase three pieces of correspondence relevant to this appeal: (1) a letter dated April 7, 2006; (2) an executed Affirmation of Unauthorized Use dated April 21, 2006; and (3) a letter dated May 17, 2006.

---

[5]Chase's records indicate that the calls were not made from the telephone number listed on the account.

In the letter dated April 7, 2006, Azur notified Chase of the fraudulent use of the card, stated that he "is formally disputing that he is responsible for the payment of any unpaid charges and accompanying finance charges on [the] account" (App. at 48A), and requested statements, correspondence, and other documents regarding the account.

The Affirmation of Unauthorized Use, which Chase drafted and sent to Azur for execution, stated, "Any transaction(s) occurring on or after 10/09/2001 is/are also unauthorized." (*Id.* at 50A.) The Affirmation listed three credits, titled "unauthorized transactions," to Azur's account: (1) a "returned payment" in the amount of $10,000; (2) a "returned payment" in the amount of $20,000; and (3) a "fraudulent transaction" in the amount of $28,717.38. (*Id.*) Azur executed the document and returned it to Chase on April 21, 2006.

Finally, in the letter dated May 17, 2006, Azur once again notified Chase that he "continues to dispute any and all unpaid charges stemming from the [Chase account], as well as all prior fraudulent transactions on that account, which have been the subject of prior communications between you and Mr. Azur and/or his representatives." (*Id.* at 52A.)

Because Azur closed the account on March 8, 2006, the account's final billing period ended on March 6, 2006. Chase has a "policy and practice" of mailing billing statements within two days of the close of each billing cycle.

**B.**

7

On February 22, 2007,[6] Azur filed an amended complaint against Chase under §§ 1643 and 1666 of the TILA, 15 U.S.C. §§ 1601 *et seq.* (2006), and common law negligence.[7] On April 8, 2008, Chase filed under seal a motion for summary judgment seeking dismissal of all three of Azur's claims.

On October 24, 2008, the Magistrate Judge issued a Report and Recommendation (R&R) suggesting that Azur's § 1643 claim proceed to trial but that Azur's other two claims be dismissed. Both parties filed objections, and Chase filed an additional motion for judgment on the pleadings for the § 1643 claim, arguing, based on this Court's decision in *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162 (3d Cir. 2008), that

---

[6]Azur filed his original complaint on August 16, 2006.

[7]Azur's requested relief included (a) "[d]amages in the amount of all payments collected by Chase for money misappropriated and [fraudulent] purchases;" (b) "[a]n injunction restraining Chase from collecting or attempting to collect, from Mr. Azur, amounts representing money misappropriated and [fraudulent] purchases;" (c) "[a]n order requiring Chase to request the removal of the adverse credit reports that Chase made to credit reporting agencies concerning Mr. Azur's credit status, and restraining Chase from submitting any further adverse credit reports concerning Mr. Azur;" and (d) "[c]ompensatory and punitive damages for Chase's unlawful submission of adverse credit reports concerning Mr. Azur's credit status." (App. at 80A-83A.)

§ 1643 does not provide the cardholder with a right to reimbursement.

On January 7, 2009, the Magistrate Judge vacated his first R&R and issued a Supplemental R&R recommending that all three of Azur's claims be dismissed. The Magistrate Judge found that (1) Azur's § 1643 claim failed because Vanek had apparent authority to use Azur's credit card; (2) Azur's § 1666 claim failed because Azur did not send Chase a timely, written notice properly identifying the specific charges and amounts he was disputing; and (3) Azur's negligence claim was barred by Pennsylvania's economic loss doctrine. In light of this finding, the Magistrate Judge recommended that Chase's motion for judgment on the pleadings be dismissed as moot. On February 3, 2009, the United States District Court for the Western District of Pennsylvania adopted the Supplemental R&R, granted Chase's motion for summary judgment on all three counts, and dismissed Chase's motion for judgment on the pleadings as moot. Azur filed a timely notice of appeal.

## II.

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367, and we have jurisdiction pursuant to 28 U.S.C. § 1291. "We review an order granting summary judgment de novo, applying the same standard used by the District Court." *Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir. 2000) (en banc). "Summary judgment is proper where the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of

9

law." *Id.* at 805-06 (citing Fed. R. Civ. P. 56(c)). "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). We may affirm the District Court's order granting summary judgment on any grounds supported by the record. *Nicini*, 212 F.3d at 805. "To the extent that the District Court made conclusions of law, our review is de novo." *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 493 F.3d 393, 399 (3d Cir. 2007) (italics omitted).

## III.

Azur appeals the District Court's order granting Chase's motion for summary judgment. Azur argues that the District Court erred in dismissing (1) his § 1643 claim based on its conclusion that Vanek had apparent authority to make the credit card charges as a matter of law; (2) his § 1666 claim based on its determination that Azur failed to meet the section's notice requirement; and (3) his negligence claim as barred by Pennsylvania's economic loss doctrine. Chase, in contrast, asks that we affirm the District Court's order. In addition, Chase contends that Azur does not have a right to reimbursement under § 1643 and that Vanek's apparent authority also precludes Azur's § 1666 claim.[8] We will begin by addressing, as an initial

---

[8]Chase also argues that Azur's contributory negligence bars his negligence claim. Chase, however, likely waived this

matter, whether § 1643 provides Azur with a right to reimbursement. Then, we will turn to Vanek's alleged apparent authority and Azur's negligence claim, respectively.[9]

## A. Right to Reimbursement

Chase argues that Azur cannot recover the money already paid to Chase under § 1643 of the TILA. We agree. Section 1643 does not provide the cardholder with a right to reimbursement. This is clear from the statute's language: "A cardholder shall be liable for the unauthorized use of a credit card only if . . . ." 15 U.S.C. § 1643(a). "Liable" means "[r]esponsible or answerable in law" or "legally obligated." *Black's Law Dictionary* 998 (9th ed. 2009). *See also Webster's Third New Int'l Dictionary* 1302 (1993) (defining "liable" as "bound or obliged according to law or equity"). Accordingly,

---

defense by failing to raise it in front of the Magistrate Judge or District Court. *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 262 (3d Cir. 2009) ("For an issue to be preserved for appeal, a party must unequivocally put its position before the trial court at a point and in a manner that permits the court to consider its merits." (quotations and citations omitted)). Regardless, because we hold that Azur's negligence claim is barred by Pennsylvania's economic loss doctrine, *see* Section C, *infra*, we do not need to reach this issue.

[9]Because we find that Vanek's apparent authority precludes both Azur's § 1643 and § 1666 claims, we decline to reach the issue of notice.

11

the statute's plain meaning places a ceiling on a cardholder's obligations under the law and thus limits a card issuer's ability to sue a cardholder to recover fraudulent purchases. The language of § 1643 does not, however, enlarge a card issuer's liability or give the cardholder a right to reimbursement.

We already reached this conclusion in *Sovereign Bank*, 533 F.3d 162. *Sovereign Bank* concerned, among other things, an indemnification action by Sovereign Bank, a card "Issuer," against Fifth Third Bank, an "Acquirer," and BJ's Wholesale Club, Inc., a "Merchant," based on Sovereign Bank's assertion that it had a duty under § 1643 to reimburse a cardholder's account for all fraudulent charges in excess of $50. *Id.* at 164, 174. We disagreed:

> "TILA § 1643 does not impose any obligation on issuers of credit cards to pay the costs associated with unauthorized or fraudulent use of credit cards. It simply limits the liability of cardholders, under certain circumstances, to a maximum of $50 for unauthorized charges. Indeed, § 1643 does not address, nor is it even concerned with, the liability of an Issuer or any party other than the cardholder for unauthorized charges on a credit card. Section 1643 imposes liability only upon the cardholder."

*Id.* at 175. Faced here with the same issue in a new context, we arrive at the same outcome: § 1643 of the TILA does not

provide the cardholder with a right to reimbursement.[10] Accordingly, to the extent that Azur requests reimbursement under § 1643 for money already paid to Chase, his claim fails.

---

[10]Although other federal courts of appeals have assumed that a right to reimbursement exists, they have done so without analysis. *See Minskoff v. Am. Exp. Travel Related Servs. Co., Inc.*, 98 F.3d 703, 707, 710 (2d Cir. 1996) (holding that the "appropriate resolution" on remand of a cardholder's § 1643 reimbursement claim is that "[the card issuer] is liable for [the user's] fraudulent purchases . . . from the time the credit card was issued until [the cardholder] received the first statement from [the card issuer] containing [the user's] fraudulent charges plus a reasonable time to examine that statement."); *DBI Architects, P.C. v. Am. Express Travel-Related Servs. Co., Inc.*, 388 F.3d 886, 888, 894 (D.C. Cir. 2004) (remanding a cardholder's § 1643 reimbursement claim to determine at what point the cardholder created apparent authority in the fraudulent user). *See also Asher v. Chase Bank USA, N.A.*, 310 F. App'x 912, 919 (7th Cir. 2009) (stating, for statute of limitations purposes, that "a violation [of § 1643] occurs when the card issuer notifies the cardholder that despite the cardholder's claim of fraud, the card issuer will not reimburse the cardholder for the disputed amount" in a nonprecedential opinion, which we cite solely due to Azur's reliance on the case at oral argument and in a subsequent Rule 28(j) letter) *and Carrier v. Citibank (S.D.), N.A.*, 383 F. Supp. 2d 334, 338, 341 (D. Conn. 2005) (assuming a right to reimbursement under a card issuer's policy of "$0 liability for unauthorized use" but holding that the fraudulent user had apparent authority).

13

## B. Apparent Authority

Vanek's alleged apparent authority is a more difficult issue. Relying on three cases, *Minskoff v. American Express Travel Related Services. Co., Inc.*, 98 F.3d 703 (2d Cir. 1996), *DBI Architects, P.C. v. American Express Travel-Related Services. Co., Inc.*, 388 F.3d 886 (D.C. Cir. 2004), and *Carrier v. Citibank (S.D.), N.A.*, 383 F. Supp. 2d 334 (D. Conn. 2005), the Magistrate Judge recommended that Azur's § 1643 claim be dismissed because Azur vested Vanek with apparent authority to make charges to the Chase account as a matter of law:

> "[T]he plaintiff vested Michele Vanek with apparent authority to use the account, as the repeated payment of billed charges led Chase to reasonably believe the charges were authorized. Furthermore, the plaintiff's failure to review his account statements and his lax supervision of Vanek, in whom he delegated authority to review his statements, prepare checks on the account, and discuss routine questions with the card issuer, constituted a negligent omission that created apparent authority in Vanek to incur the charges."

(App. at 17A.) The District Court agreed and dismissed Azur's § 1643 claim. On appeal, Azur argues that whether he clothed Vanek with apparent authority is an issue of fact to be decided by a jury.

The application of both §§ 1643 and 1666 of the TILA depend, in part, on whether the fraudulent user had apparent

14

authority to use the credit card. As stated above, § 1643 provides that "[a] cardholder shall be liable for the unauthorized use of a credit card" in certain circumstances. 15 U.S.C. § 1643(a). The term "unauthorized use" is defined as the "use of a credit card by a person other than the cardholder who does not have actual, implied, or apparent authority for such use and from which the cardholder receives no benefit." 15 U.S.C. § 1602(o). Relatedly, § 1666(a) sets forth the procedures a creditor must follow to resolve alleged billing errors. 15 U.S.C. § 1666(a). Like the phrase "unauthorized use," the phrase "billing error" includes "[a] reflection on or with a periodic statement of an extension of credit that is not made to the consumer or to a person who has actual, implied, or apparent authority to use the consumer's credit card or open-end credit plan." 12 C.F.R. § 226.13(a)(1).

To determine whether apparent authority exists, we turn to applicable state agency law. *See* 12 C.F.R. Pt. 226, Supp. I ("Whether such [apparent] authority exists must be determined under state or other applicable law."); *Minskoff*, 98 F.3d at 708 ("'Congress apparently contemplated, and courts have accepted, primary reliance on background principles of agency law in determining the liability of cardholders for charges incurred by third-party card bearers.'" (quoting *Towers World Airways v. PHH Aviation Sys.*, 933 F.2d 174, 176-77 (2d Cir. 1991))). In this case, the parties do not refute the application of Pennsylvania law. Citing the Restatement (Second) of Agency, the Pennsylvania Supreme Court has explained as follows:

> "Apparent authority is power to bind a principal which the principal has not actually granted but

which he leads persons with whom his agent deals to believe that he has granted. Persons with whom the agent deals can reasonably believe that the agent has power to bind his principal if, for instance, the principal knowingly permits the agent to exercise such power or if the principal holds the agent out as possessing such power."

*Revere Press, Inc. v. Blumberg*, 246 A.2d 407, 410 (Pa. 1968). Similarly, we have stated that under Pennsylvania law "[t]he test for determining whether an agent possesses apparent authority is whether a man of ordinary prudence, diligence and discretion would have a right to believe and would actually believe that the agent possessed the authority he purported to exercise." *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 345 (3d Cir. 2004) (quotations and citations omitted).[11]

---

[11]Pennsylvania agency law is comparable to general agency law principles. Restatement (Second) of Agency § 8 provides that "[a]pparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons," and § 27 explains that the "apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." Restatement (Second) of Agency §§ 8 and 27 (1958). Agency Third, adopted in 2005 and published in 2006, is

16

Although the articulation of the proper agency law standard is fairly easy, the application of that standard is difficult. Two decisions of the Second and D.C. Circuits, respectively, are instructive. In both cases, the Second and D.C. Circuits held that a cardholder's negligent omissions clothed the fraudulent card user with apparent authority under facts similar to those present in the instant case.

The Second Circuit in *Minskoff* was the first court of appeals to address this issue. Minskoff served as the president and chief executive officer of a real estate firm. 98 F.3d at 706. In 1988, the firm opened an American Express corporate credit card account and issued one card in Minskoff's name. *Id.* In 1992, Minskoff's assistant, whom the firm had recently hired, applied for and obtained an additional card to the account in her own name without Minskoff's or the firm's knowledge. *Id.* From April 1992 to March 1993, the assistant charged a total of $28,213.88 on the corporate card. *Id.* During this period, American Express sent twelve monthly billing statements to the firm's address; each statement listed both Minskoff and the assistant as cardholders and separately itemized their charges. *Id.* At the same time, American Express was paid in full by a total of twelve forged checks drawn on bank accounts

---

similar: "apparent authority" is "the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) of Agency § 2.03 (2006).

maintained by either Minskoff or the firm at Manufacturers Hanover Trust (MHT), which also periodically mailed statements to the firm showing that the payments had been made. *Id.* at 706-07, 710. The assistant used the same system to misappropriate another $300,000 after applying for a platinum account. *Id.* at 707, 710. After discovering the fraud, Minskoff filed suit against American Express under the TILA. *Id.* at 707.

In determining whether or not the assistant had apparent authority to use the credit card, the Second Circuit began by differentiating between the acquisition and use of a credit card obtained through fraud or theft: "[W]hile we accept the proposition that the *acquisition* of a credit card through fraud or theft cannot be said to occur under the apparent authority of the cardholder, [that] should not . . . preclude a finding of apparent authority for the subsequent *use* of a credit card so obtained." *Id.* at 709. Then, noting that "[n]othing in the TILA suggests that Congress intended to sanction intentional or negligent conduct by the cardholder that furthers the fraud or theft of an unauthorized card user," the court held that "the negligent acts or omissions of a cardholder may create apparent authority to use the card in a person who obtained the card through theft or fraud." *Id.* Applying that reasoning to the facts before it, the Second Circuit found that Minskoff's and the firm's failure to examine any of the credit card or bank statements created, as a matter of law, "apparent authority for [the assistant's] continuing use of the cards, especially because it enabled [the assistant] to pay all of the American Express statements with forged checks, thereby fortifying American Express' continuing

18

impression that nothing was amiss with the Corporate and Platinum Accounts." *Id.* at 710.[12]

In *DBI Architects*, the D.C. Circuit took a narrower approach. DBI was a corporation with an AMEX[13] credit card account. 388 F.3d at 888. In 2001, DBI appointed a new account manager of its D.C. and Virginia offices. Soon thereafter, the new manager requested that AMEX add her as a cardholder on DBI's corporate account without DBI's knowledge, although AMEX sent DBI an account statement reflecting the change. *Id.* From August 2001 to May 2002, the manager charged a total of $134,810.40 to the credit card. *Id.* As in *Minskoff*, AMEX sent DBI ten monthly billing statements – each listing the manager as a cardholder and itemizing her charges – and the manager paid AMEX with thirteen DBI checks. *Id.* Most of the checks were signed or stamped in the name of DBI's president; none were signed in the manager's own name. *Id.* Like Minskoff, DBI eventually filed suit against AMEX under the TILA. *Id.* at 888.

---

[12]The Second Circuit relied in part on a New York law obligating consumers to exercise reasonable care and promptness in examining bank statements for errors. *Minskoff*, 98 F.3d at 709. According to the court, the law derived from common law obligations. *Id.*

[13]"AMEX" is the abbreviation used by the *DBI Architects* court to refer to American Express Travel-Related Services Company. 388 F.3d at 887.

Acquainted with the Second Circuit's decision in *Minskoff*, the D.C. Circuit decided its case on narrower grounds. Rather than fault the cardholder for merely failing to inspect monthly credit card statements, the court focused on the cardholder's continuous payment of the fraudulent charges without complaint:

> "DBI is correct that its failure to inspect its monthly billing statements did not clothe [the manager] with apparent authority to use its corporate AMEX account. [However,] AMEX is correct that DBI clothed [the manager] with apparent authority to use its corporate AMEX account by repeatedly paying without protest all of [the manager's] charges on the account after receiving notice of them from AMEX."

*Id.* at 891. The court later explained its reasoning as follows:

> "By identifying apparent authority as a limit on the cardholder's protection under § 1643, Congress recognized that a cardholder has certain obligations to prevent fraudulent use of its card. DBI's troubles stemmed from its failure to separate the approval and payment functions within its cash disbursement process. [The manager] had actual authority both to receive the billing statements and to issue DBI checks for payment to AMEX. While DBI did not voluntarily relinquish its corporate card to [the manager], it did mislead AMEX into reasonably

20

believing that [the manager] had authority to use the corporate card by paying her charges on the corporate account after receiving AMEX's monthly statements identifying her as a cardholder and itemizing her charges."

*Id.* at 893. Although the court acknowledged that payment might not always create apparent authority, it held that such authority existed as a matter of law in that case:

"[T]his is not a case involving an occasional transgression buried in a welter of financial detail. [] Nor is this a case involving payment without notice, as might occur when a cardholder authorizes its bank to pay its credit card bills automatically each month. Where, as here, the cardholder repeatedly paid thousands of dollars in fraudulent charges for almost a year after monthly billing statements identifying the fraudulent user and itemizing the fraudulent charges were sent to its corporate address, no reasonable juror could disagree that at some point the cardholder led the card issuer reasonably to believe that the fraudulent user had authority to use its card."

*Id.* at 893-94 (quotations and citation omitted). Ultimately, the court remanded the case to determine at what point the manager's apparent authority began. *Id.* at 894.

We agree with the D.C. Circuit's more nuanced analysis. "Apparent authority is power to bind a principal which the

21

principal has not actually granted but which he leads persons with whom his agent deals to believe that he has granted." *Revere Press*, 246 A.2d at 410. A cardholder may, in certain circumstances, vest a fraudulent user with the apparent authority to use a credit card by enabling the continuous payment of the credit card charges over a period of time. As the D.C. Circuit reasoned, by identifying apparent authority as a limitation on the cardholder's protections under § 1643, Congress recognized that the cardholder is oftentimes in the best position to identify fraud committed by its employees.

Here, Azur's negligent omissions led Chase to reasonably believe that the fraudulent charges were authorized. Although Azur may not have been aware that Vanek was using the Chase credit card, or even that the Chase credit card account existed, Azur knew that he had a Dollar Bank checking account, and he did not review his Dollar Bank statements or exercise any other oversight over Vanek, his employee. Instead, Azur did exactly what the D.C. Circuit in *DBI Architects* cautioned against: he "fail[ed] to separate the approval and payment functions within [his] cash disbursement process." 388 F.3d at 893. Had Azur occasionally reviewed his statements, Azur would have likely noticed that checks had been written to Chase. Because Chase reasonably believed that a prudent business person would oversee his employees in such a manner, Chase reasonably relied on the continuous payment of the fraudulent charges.

Many of Azur's counter-arguments are beside the point. Azur asserts that *Minskoff* and *DBI Architects* are distinguishable because the fraudulent users in those cases were cardholders on the accounts. This distinction is irrelevant:

22

Chase's belief that the fraudulent charges were authorized did not depend on whether the fraudulent charges were made by a second cardholder; Chase's belief was contingent upon the continuous payment of the fraudulent charges – regardless of which card they were on – without objection. Azur also focuses on Chase's failure to identify the fraud.[14] The issue, however, is whether Azur led Chase to believe that Vanek had authority to make the charges, not whether Chase's fraud-detecting tools were effective. Moreover, Vanek's ability to answer the account security questions over the telephone and the fact that Chase's fraud-detecting tools identified relatively few problems reinforce the conclusion that Chase was reasonable in believing, and did in fact believe, that the charges were authorized. In short, none of the arguments Azur has advanced persuade us to disturb the District Court's apparent authority determination.

Accordingly, we hold that Azur vested Vanek with apparent authority to use the Chase credit card, thus barring his §§ 1643 and 1666 claims.

---

[14]First, Azur argues that Chase could not have reasonably believed that the charges were authorized because (1) Vanek's telephone calls were made from telephone numbers that did not match the number listed on the account, and (2) Vanek was female, when the account indicated that the only cardholder was male. Second, Azur contends that Chase's fraud-detecting tools, including FALCON, were ineffective because only three out of hundreds of fraudulent transactions triggered a response.

## C. Economic Loss Doctrine

Lastly, the District Court adopted the Magistrate Judge's recommendation and held that Pennsylvania's economic loss doctrine bars Azur's common law negligence claim against Chase. On appeal, Azur contends that the Pennsylvania Supreme Court case *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270 (Pa. 2005), created an exception to the doctrine that applies to Azur because Azur does not have a contractual remedy. In response, Chase argues that the *Bilt-Rite* exception is narrow and does not cover Azur's claim.

Pennsylvania's economic loss doctrine "'provides that no cause of action exists for negligence that results solely in economic damages unaccompanied by physical or property damage.'" *Sovereign Bank*, 533 F.3d at 175 (quoting *Adams v. Copper Beach Townhome Cmtys., L.P.*, 816 A.2d 301, 305 (Pa. Super. 2003)). The doctrine "'is concerned with two main factors: foreseeability and limitation of liability.'" *Id.* (quoting *Adams*, 816 A.2d at 307). The first Pennsylvania appellate court to discuss the doctrine explained,

> "To allow a cause of action for negligent cause of purely economic loss would be to open the door to every person in the economic chain of the negligent person or business to bring a cause of action. Such an outstanding burden is clearly inappropriate and a danger to our economic system."

*Aikens v. Baltimore & Ohio R.R. Co.*, 501 A.2d 277, 279 (Pa. Super. 1985). The Pennsylvania Supreme Court has recognized the doctrine's existence. *See Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840, 841-43 (Pa. 2009).

The Pennsylvania Supreme Court crafted a narrow exception to the doctrine in *Bilt-Rite*, where a building contractor filed a negligent misrepresentation claim against an architect after its reliance on the architect's allegedly incorrect plans in its winning bid resulted in economic loss. 866 A.2d at 272. Adopting Section 552 of the Restatement (Second), which "sets forth the parameters of a duty owed when one supplies information to others, for one's own pecuniary gain, where one intends or knows that the information will be used by others in the course of their own business activities," *id.* at 285-86, the court refused to apply the economic loss doctrine to claims of negligent misrepresentation under Section 552: "to apply the economic loss doctrine in the context of a Section 552 claim would be nonsensical: it would allow a party to pursue an action only to hold that, once the elements of the cause of action are shown, the party is unable to recover for its losses," *id.* at 288.

The Pennsylvania Supreme Court emphasized the narrow scope of the *Bilt-Rite* exception in *Excavation Techs.*, where an excavator filed a negligent misrepresentation claim against a utility company pursuant to § 552 after the excavator sustained economic damages because the utility company erred in marking the locations of some of the gas lines. 985 A.2d at 841, 844. In applying the economic loss doctrine, the court distinguished the case from *Bilt-Rite* on the grounds that, unlike architects, "[a] facility owner [] does not engage in supplying information to

25

others for pecuniary gain. . . . [Therefore], § 552(1) and (2) do not apply here." *Id.* at 843 (quotations and citations omitted). The court also declined to expand the exception: "[P]ublic policy weighs against imposing liability here. Permitting recovery would shift the burden from excavators, who are in the best position to employ prudent techniques on job sites to prevent facility breaches." *Id.* at 844.

We agree with Chase that the Pennsylvania Supreme Court would likely hold that the economic loss doctrine bars Azur's negligence claim: Azur's economic damages are unaccompanied by physical or property damage and, because Chase is not in the business of providing Azur with information for pecuniary gain, this is not the § 552 negligent misrepresentation case contemplated by *Bilt-Rite*. Rather, like *Excavation*, we find that Pennsylvania public policy weighs against imposing liability because cardholders, and not card issuers, are in the best position to prevent employees with access to security information from committing fraud.

Azur's main argument against the imposition of the economic loss doctrine focuses on Azur's assertion that he does not have a contractual remedy. However, we already rejected an identical argument in *Sovereign Bank*, where we applied the doctrine in a case concerning a card issuer's negligence claim against other financial institutions with which it had no contractual relationship. We explained,

> "*Bilt-Rite* did not hold that the economic loss doctrine may not apply where the plaintiff has no available contract remedy. . . . [T]he Bilt-Rite

26

Court simply carved-out an exception to allow a commercial plaintiff to seek recourse from an 'expert supplier of information' with whom the plaintiff has no contractual relationship, in very narrow circumstances not relevant here. [] The Pennsylvania Supreme Court emphasized that its holding was limited to those 'businesses' which provide services and/or information that they know will be relied upon by third parties in their business endeavors."

*Sovereign Bank*, 533 F.3d at 180 (citing *Bilt-Rite*, 866 A.2d at 286). Therefore, Azur's contention that the *Bilt-Rite* exception encompasses all cases in which the plaintiff has no contractual remedy is without support.

## IV.

For the foregoing reasons, we will affirm, on partly different grounds, the order of the District Court.[15] As an initial matter, we hold that § 1643 of the TILA does not provide the cardholder with a right to reimbursement. With regards to the specifics of the instant case, we find that Azur vested Vanek with apparent authority to use the Chase card and thus that Azur's §§ 1643 and 1666 claims cannot stand. Finally, we hold that Pennsylvania's economic loss doctrine bars Azur's common law negligence claim.

---

[15]We decline to reach the issue of notice under § 1666. *See* note 9, *supra*.