DANIEL R. DOMÍNGUEZ, United States District Judge
On June 7, 2017, Miguel Más de León (hereinafter, the "Plaintiff") filed a Complaint (Docket No. 1) against Banco Popular de Puerto Rico (hereinafter, "Banco Popular") and Kenneth Colondres (hereinafter, "Colondres"). In response to the Complaint, on September 27, 2017, Banco Popular filed a Motion Dismiss [sic] the Complaint to Fed.R.Civ.P. 12(b)(6) (Docket No. 14). The Plaintiff opposed the motion on December 8th, 2017 (Docket No. 16). Through its Motion to Dismiss , Banco Popular essentially seeks to dismiss the instant case on the basis that the Plaintiff has failed to state a claim. Specifically, Banco Popular alleges that 15 U.S.C. § 1643, which is the federal law under which this civil action arose, requires that the use of Plaintiff's credit card at issue must be unauthorized. Nonetheless, in the present case, the Plaintiff did not comply with this statutory requirement because he *281 authorized Colondres for the use of his credit card. Consequently as expressed in this Opinion and Order, this Court GRANTS Banco Popular's Motion To Dismiss (Docket No. 14). The Court explains.
I. FACTUAL BACKGROUND
On June of the year 2016, the Plaintiff agreed to lend his credit card to Colondres, which he was to use for the sole purpose of paying some business debts, ascending only to $3,500. (Docket No. 1 at 2) However, when the Plaintiff received his credit card statement for that same month of June, it showed that Colondres had made transactions over $12,500. (Docket No. 1 at 2) The Plaintiff proceeded to contact Colondres to inquire about the charges, to which Colondres explained that he was to receive some money he was owed soon and then he would pay the Plaintiff back. (Docket No. 1 at 2-3).
On or before June 28th, 2016, the Plaintiff contacted Banco Popular because he was to go on vacations to Mexico on June 28th, 2016. (Docket No. 1 at 3) In these calls, the Plaintiff told the bank representative that he only authorized the transactions that were to be made from Mexico. (Docket No. 1 at 3)
Nevertheless, when the Plaintiff arrived from his vacation on July 11th, 2016, he learned that Colondres had charged over $31,000 on his credit card. (Docket No. 1 at 3) On July 22nd, 2016, eleven days later, the Plaintiff visited Banco Popular to inquire about these the charges to his credit card made by Colondres. (Docket No. 1 at 3) It is unclear from the Complaint whether Banco Popular effectively canceled the Plaintiff's credit card. Notwithstanding, the Complaint does state that the Plaintiff proceeded to pay the debt incurred by Colondres on his credit card. (Docket No. 1 at 3)
Afterwards, on July 27th, 2016, the Plaintiff had filed a criminal complaint against Mr. Colondres. (Docket No. 1 at 3) On this day, the Plaintiff also sent a certified letter to Colondres, in which "[h]e stated inter alia that the unauthorized charges, progressively made by the latter, had topped to $37,035.99 and that if the whole amount was not paid by July 29, 2016, we would take legal action against him." (Docket No. 1 at 3) Subsequently, the Plaintiff called Colondres to inquire about the increased expenses. (Docket No. 1 at 3) In response, Colondres again reiterated that he was waiting to receive payment for a debt in order to pay the Plaintiff back. (Docket No. 1 at 3)
On July 30th, 2016, the Plaintiff hand-delivered a letter to Banco Popular, in which he:
[A]sked for assistance handling the unauthorized debt, as he always has had good credit, advised Banco Popular on the unauthorized usage of his credit card by Mr. Colondres, as well as the filing of the criminal complaint filed against the latter for said actions, and inquired on Banco Popular's actions on allowing charge to his card, without being notified about it, even when he advised Banco Popular before he went off on vacation on June 28, 2016 that he would be out of Puerto Rico on vacation, and charges were still continually being made from Puerto Rico, and not Mexico.
(Docket No. 1 at p. 3-4).
To date, Colondres still owes money to the Plaintiff, even though he paid $2,400.00 to the Plaintiff. (Docket No. 1 at 4)
II. STANDARD OF REVIEW
Federal Rule of Civil Procedure 8(a) requires plaintiffs to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Bell Atlantic v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Court *282 determined was decided that a plaintiff must "provide the grounds of his entitlement [with] more than labels and conclusions ." See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (emphasis ours) ("[I]n order to 'show' an entitlement to relief a complaint must contain enough factual material 'to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).' ") (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955 ) (citation omitted). Thus, a plaintiff must, and is now required to, present allegations that "nudge [his] claims across the line from conceivable to plausible" in order to comply with the requirements of Rule 8(a). Twombly, 550 U.S. at 570, 127 S.Ct. 1955 ; see e.g. Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).
When considering a motion to dismiss, the Court's inquiry occurs in a two-step process under the current context-based "plausibility" standard established by Twombly, 550 U.S. 544, 127 S.Ct. 1955, and Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. "Context based" means that a Plaintiff must allege sufficient facts that comply with the basic elements of the cause of action. See Iqbal, 556 U.S. at 677-79, 129 S.Ct. 1937 (concluding that plaintiff's complaint was factually insufficient to substantiate the required elements of a Bivens claim, leaving the complaint with only conclusory statements). First, the Court must "accept as true all of the allegations contained in a complaint[,]" discarding legal conclusions, conclusory statements and factually threadbare recitals of the elements of a cause of action. Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. "Yet we need not accept as true legal conclusions from the complaint or 'naked assertion[s]' devoid of 'further factual enhancement.' " Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009) (quoting Twombly, 550 U.S. at 557, 127 S.Ct. 1955 ).
Under the second step of the inquiry, the Court must determine whether, based upon all assertions that were not discarded under the first step of the inquiry, the complaint "states a plausible claim for relief." Iqbal, 556 U.S. at 679, 129 S.Ct. 1937. This second step is "context-specific" and requires that the Court draw from its own "judicial experience and common sense" to decide whether a plaintiff has stated a claim upon which relief may be granted, or, conversely, whether dismissal under Rule 12(b)(6) is appropriate. Id.
Thus, "[i]n order to survive a motion to dismiss, [a] plaintiff must allege sufficient facts to show that he has a plausible entitlement to relief." Sanchez v. Pereira-Castillo, 590 F.3d 31, 41 (1st Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]' 'that the pleader is entitled to relief.' " Iqbal, 556 U.S. at 679, 129 S.Ct. 1937 (quoting Fed. R. Civ. P. 8(a)(2) ). Furthermore, such inferences must be at least as plausible as any "obvious alternative explanation." Id. at 679-80, 129 S.Ct. 1937 (citing Twombly, 550 U.S. at 567, 127 S.Ct. 1955 ). "A plaintiff is not entitled to 'proceed perforce' by virtue of allegations that merely parrot the elements of the cause of action ." Ocasio-Hernandez, 640 F.3d at 12, (citing Iqbal, 556 U.S. at 679, 129 S.Ct. 1937 ) (emphasis ours).
A complaint that rests on "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like" will likely not survive a motion to dismiss . Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996) (emphasis ours). Similarly, unadorned factual assertions as to the elements of the cause of action are inadequate as well. Penalbert-Rosa v. Fortuno-Burset, 631 F.3d 592 (1st Cir. 2011). "Specific information, even if not in the form of *283 admissible evidence, would likely be enough at [the motion to dismiss] stage; pure speculation is not." Id. at 596 ; see Iqbal, 556 U.S. at 681, 129 S.Ct. 1937 ("To be clear, we do not reject ... bald allegations on the ground that they are unrealistic or nonsensical.... It is the conclusory nature of [the] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."); see Mendez Internet Mgmt. Servs. v. Banco Santander de P.R., 621 F.3d 10, 14 (1st Cir. 2010) (The Twombly and Iqbal standards require District Courts to "screen... out rhetoric masquerading as litigation.").
The First Circuit has cautioned against equating plausibility with an analysis of the likely success on the merits, affirming that the plausibility standard assumes "pleaded facts to be true and read in a plaintiff's favor" "even if seemingly incredible." Sepúlveda-Villarini v. Dep't of Educ. of P.R., 628 F.3d F.3d 25, 30 (1st Cir. 2010) (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955 ); Ocasio-Hernandez, 640 F.3d at 12 (citing Iqbal, 556 U.S. at 679, 129 S.Ct. 1937 ); see Twombly, 550 U.S. at 556, 127 S.Ct. 1955 ("[A] well-pleaded complaint may proceed even if it appears that a recovery is very remote and unlikely.") (internal quotation marks omitted); see Ocasio-Hernandez, 640 F.3d at 12 (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955 ) ("[T]he court may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.' "). Therefore, dismissal under Rule 12(b)(6) is appropriate if the facts alleged, taken as true, "must state a plausible, not a merely conceivable, case for relief." Sepúlveda-Villarini, 628 F.3d at 29.
III. ANALYSIS
A. Relevant Case Law
The Plaintiff predicates his Complaint (Docket No. 1) in the Truth in Lending Act , 15 U.S.C. §§ 1601-et seq. , which states in its § 1643 :
(a) Limits on liability.
(1) A cardholder shall be liable for the unauthorized use of a credit card only if-
(A) the card is an accepted credit card;
(B) the liability is not in excess of $ 50;
(C) the card issuer gives adequate notice to the cardholder of the potential liability;
(D) the card issuer has provided the cardholder with a description of a means by which the card issuer may be notified of loss or theft of the card, which description may be provided on the face or reverse side of the statement required by section 127(b) [ 15 USCS § 1637(b) ] or on a separate notice accompanying such statement;
(E) the unauthorized use occurs before the card issuer has been notified that an unauthorized use of the credit card has occurred or may occur as the result of loss, theft, or otherwise; and
(F) the card issuer has provided a method whereby the user of such card can be identified as the person authorized to use it.
(2) For purposes of this section, a card issuer has been notified when such steps as may be reasonably required in the ordinary course of business to provide the card issuer with the pertinent information have been taken, whether or not any particular officer, employee, or agent of the card issuer does in fact receive such information.
(b) Burden of proof. In any action by a card issuer to enforce liability for the use of a credit card, the burden of proof is upon the card issuer to show *284 that the use was authorized or, if the use was unauthorized, then the burden of proof is upon the card issuer to show that the conditions of liability for the unauthorized use of a credit card, as set forth in subsection (a), have been met.
(c) Liability imposed by other laws or by agreement with issuer. Nothing in this section imposes liability upon a cardholder for the unauthorized use of a credit card in excess of his liability for such use under other applicable law or under any agreement with the card issuer.
(d) Exclusiveness of liability. Except as provided in this section, a cardholder incurs no liability from the unauthorized use of a credit card.
15 U.S.C. § 1643 (emphasis added).
"Although the Truth in Lending Act does not state explicitly that a cardholder can bring a suit claiming a violation of 15 U.S.C. § 1643, the majority of other circuit and district courts faced with such a claim have assumed, on similar facts, the existence of a cardholder claim under § 1643." Asher v. Chase Bank United States, N.A., 310 Fed.Appx. 912, 916 (7th Cir. 2009). Despite the fact that the Truth in Lending Act was created for the consumers' benefit, "it is a well-settled rule of statutory construction that the plain language of a statute offers the primary guidance to its meaning." Martin v. American Express, 361 So.2d 597, 600 (Ala. Civ. App. 1978).
As stated in the cited statute, "[t]he Truth-in-Lending Act places a limit of $ 50 on the liability of a credit cardholder for charges incurred by an 'unauthorized' user." Towers World Airways, Inc. v. PHH Aviation Sys., Inc., 933 F.2d 174, 175 (2d Cir. 1991). The Second Circuit expressed in Towers World Airways that, "[w]here an unauthorized use has occurred, the cardholder can be held liable only up to a limit of $ 50 for the amount charged on the card, if certain conditions are satisfied." Towers World Airways, 933 F.2d at 176. Nevertheless, the Act does not "limit liability for the cardholder for third party charges made with 'actual, implied or apparent authority'." Stieger v. Chevy Chase Sav. Bank, 666 A.2d 479, 482 (D.C. 1995). That is to say, if the cardholder actually, impliedly or apparently authorized another to use of his/her credit card, then the Act does not provide the cardholder a remedy.
The Act further defines "unauthorized use" as "use of a credit card by a person other than the cardholder who does not have actual, implied, or apparent authority for such use and from which the cardholder receives no benefit." Id. § 1602(p). Therefore, as determined by the plain meaning of the statute, the definition of "unauthorized use" does not include use by a person who has actual, implied, or apparent authority.
Moreover, the published commentary regarding the regulations at issue provides that "whether authority exists must be determined under state or other applicable law." Federal Reserve Board Truth in Lending Official Staff Commentary to Regulation Z, 12 C.F.R. pt. 226, Supp. I § 226.12(b)(1). In this regard, Federal Courts have determined that "federal common law [is] in accord with the Restatement (Second) of Agency on the issue of apparent authority." Asher, 310 Fed. Appx. at 920. Therefore, in the case at bar, we must adopt its interpretation.
The Restatement refers to the term "authority" as "the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him." Restatement (Second) of Agency § 7 (1958). Hence, "[a] cardholder, as principal, can create express and implied authority only through manifestations to the user of *285 consent to the particular transactions into which the user has entered." Towers World Airways, 933 F.2d at 177. Further, "[s]uch authority may be express or implied, but in either case it exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act." Minskoff v. Am. Express Travel Related Servs. Co., 98 F.3d 703, 708 (2d Cir. 1996).
Similar to the case at bar, in Martin , 361 So.2d at 599, the plaintiff had given his credit card to his business associate to "charge up to $500" on it. However, his business associate went on to charge around $5,300. The court concluded that the plaintiff "authorized" his business associate to make those charges on his credit card as defined in the Act, even though the charges exceeded the amount the plaintiff personally authorized. Specifically, the court stated that "in instances where a cardholder, who is under no compulsion by fraud, duress or otherwise, voluntarily permits the use of his (or her) credit card by another person, the cardholder has authorized the use of that card and is thereby responsible for any charges as a result of that use." Martin, 361 So.2d at 599.
The Plaintiff brings also to attention of this Court § 1666(a) of the Act, which states:
(a) Written notice by obligor to creditor; time for and contents of notice; procedure upon receipt of notice by creditor. If a creditor, within sixty days after having transmitted to an obligor a statement of the obligor's account in connection with an extension of consumer credit, receives at the address disclosed under section 127(b)(10) [ 15 USCS § 1637(b)(10) ] a written notice (other than notice on a payment stub or other payment medium supplied by the creditor if the creditor so stipulates with the disclosure required under section 127(a)(7) ) [ 15 USCS § 1637(a)(7) ] ) from the obligor in which the obligor-
(1) sets forth or otherwise enables the creditor to identify the name and account number (if any) of the obligor,
(2) indicates the obligor's belief that the statement contains a billing error and the amount of such billing error, and
(3) sets forth the reasons for the obligor's belief (to the extent applicable) that the statement contains a billing error,
the creditor shall, unless the obligor has, after giving such written notice and before the expiration of the time limits herein specified, agreed that the statement was correct-
(A) not later than thirty days after the receipt of the notice , send a written acknowledgment thereof to the obligor, unless the action required in subparagraph (B) is taken within such thirty-day period, and
(B) not later than two complete billing cycles of the creditor (in no event later than ninety days) after the receipt of the notice and prior to taking any action to collect the amount, or any part thereof, indicated by the obligor under paragraph (2) either-
(i) make appropriate corrections in the account of the obligor, including the crediting of any finance charges on amounts erroneously billed, and transmit to the obligor a notification of such corrections and the creditor's explanation of any change in the amount indicated by the obligor under paragraph (2) and, if any such change is made and the obligor so requests, copies of documentary evidence of the obligor's indebtedness; or *286 (ii) send a written explanation or clarification to the obligor, after having conducted an investigation, setting forth to the extent applicable the reasons why the creditor believes the account of the obligor was correctly shown in the statement and, upon request of the obligor, provide copies of documentary evidence of the obligor's indebtedness. In the case of a billing error where the obligor alleges that the creditor's billing statement reflects goods not delivered to the obligor or his designee in accordance with the agreement made at the time of the transaction, a creditor may not construe such amount to be correctly shown unless he determines that such goods were actually delivered, mailed, or otherwise sent to the obligor and provides the obligor with a statement of such determination.
After complying with the provisions of this subsection with respect to an alleged billing error, a creditor has no further responsibility under this section if the obligor continues to make substantially the same allegation with respect to such error.
Fair Credit Billing Act, 15 U.S.C. § 1666(a) (emphasis added).
Therefore, in order "[t]o trigger the creditor's obligation to reinvestigate and verify the billing, the debtor must give written notice of the specific dispute within sixty days of receipt of the statement." Pinner v. Schmidt, 805 F.2d 1258, 1264 (5th Cir. 1986). These "sixty days" start "after the creditor [has] transmitted the first periodic statement that reflects that alleged billing error." 12 C.F.R. § 226.13(b)(1). And it is then that "[u]pon receipt of a timely notice from the consumer, the creditor must send the consumer written acknowledgment that the notice was received within thirty days." Gengo v. Target Nat'l Bank, 513 F.Supp.2d 842, 850 (S.D. Tex. 2007) (attending specifically the process to be done under § 1666(a) ).
This particular section pertains to the situations where the cardholder timely and adequately provides written notice to the card issuer about an alleged "billing error" of his (or her) credit card statement. However, in 12 C.F.R. 226.13(1)(a), the definition of "billing error" includes: "A reflection on or with a periodic statement of an extension of credit that is not made to the consumer or to a person who has actual, implied, or apparent authority to use the consumer's credit card ." Id. (emphasis added).
B. Application to the Case at Bar
Co-Defendant Banco Popular states that the Plaintiff has failed to state a claim upon which relief can be granted. Given that Plaintiff filed a Complaint based on the § 1643, essentially the Plaintiff seeks to argue that he is not to be held liable for the "unauthorized use" of his credit card by Colondres. Although the Plaintiff first communicated with Banco Popular to report these "unauthorized use" on July 22nd, 2016, the Plaintiff knew of the incidents since before June 28th, 2016. Nevertheless, he deliberately omitted to inform Banco Popular of the occurrences. Moreover, the Court is concerned that the Plaintiff had the opportunity to notify Banco Popular of said "unauthorized use" when he called before his vacations to Mexico, but-as this Court has pointed out-he opted not to notify the bank. Accordingly, the issue before the Court is whether the Plaintiff's actions and omissions constituted an "unauthorized use" in accordance to the applicable law standard.
The Complaint in this instant alleges there were two incidents where the Plaintiff acquired knowledge of the "unauthorized use" of the Plaintiff's credit card. First, around June of 2016, the Plaintiff *287 authorized Colondres to charge an amount of $3,500 to settle some debts, but instead Colondres charged around $12,000 on the Plaintiff's credit card to pay off business related debt. Second, about a month later, Colondres charged again around $30,000.
The Court is of the opinion that the Plaintiff gave actual authorization to Colondres when he charged the first $12,000 because on the month of June 2016 the Plaintiff agreed to let Colondres use his credit card to pay off his debts. Where a credit card is misused for reasons outside of the agreed scope, the plaintiff is "not entitled to rely on the provisions contained in section 1643(a) and he must be held responsible for any purchases made through the use of his card." Martin, 361 So.2d at 600. For this reason, the Court finds that the Plaintiff gave actual authorization to Colondres for the first charges up to $12,000, even though Mr. Colondres did not use it for the quantity that was agreed. Consequently, this transaction is not covered by the Act and the allegations should be dismissed accordingly.
The Court must now determine whether the additional $30,000 transactions made after the first $12,000 were "unauthorized use" such that they would fall under the protections of the Act. As previously stated, "unauthorized use" is defined as the "use of a credit card by a person other than the cardholder who does not have actual, implied, or apparent authority for such use and from which the cardholder receives no benefit." 15 U.S.C. § 1602. Also, the statute is clear when it states that: "[a] cardholder shall be liable for the unauthorized use of a credit card only if ... the unauthorized use occurs before the card issuer has been notified that an unauthorized use of the credit card has occurred." Id. § 1643 (emphasis added). Rules of statutory interpretation provide that "[i]f the statute is clear and unambiguous 'that is the end of the matter, for the court, ... must give effect to the unambiguously expressed intent of Congress.' " Bd. of Governors of Fed. Res. Sys. v. Dimension Fin. Corp. , 474 U.S. 361, 368, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986) (quoting Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc. , 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ).
This Court is of the Opinion that the Plaintiff's actions and omissions led to the apparent authorized use of his credit card by Colondres for the charges leading up to $30,000 because during June 2016 the Plaintiff did not inform Banco Popular of the alleged incidents of "unauthorized use" when he called the bank to notify about his vacations to Mexico. In other words, when the Plaintiff called the bank for his trip to Mexico, he never mentioned that Colondres had exceeded his authorization of the credit card use, having the opportunity to then to act. As expressed by the Third Circuit, "[a] cardholder may, in certain circumstances, vest a fraudulent user with the apparent authority to use a credit card by enabling the continuous payment of the credit card charges over a period of time." Azur v. Chase Bank, USA, 601 F.3d 212, 221 (3rd Cir. 2010).
However, should the Plaintiff have informed the "unauthorized use" of his credit card before his trip to Mexico, he could have limited the scope of his liability. See DBI Architects v. American Express Travel-Related Servs., 388 F.3d 886, 889 (D.C. 2004) ("[T]he cardholder is not liable for unauthorized charges incurred after the cardholder notifies the issuer of the fraud.") The Plaintiff could have also cancelled his card as soon as he found out that Colondres exceeded his authority to charge $3,500 on his card because as "[w]here a card issuer permits a cardholder to cancel the card, and thereby any contractual obligation to pay, a cardholder *288 can limit his liability even if unable to regain possession by cancelling his card." Towers World Airways, 933 F.2d at 179. Further, Towers World Airways established "that by foreclosing card issuers from recovering unauthorized charges from cardholders, section 1643(a)(1) undoubtedly encourages card issuers to facilitate the cancellation of cards once a possible unauthorized use has been reported." Id. Therefore, the Court finds that the charges leading up to $30,000 were apparently authorized , using the statute language, because the Plaintiff knew about the alleged unauthorized charges and had the opportunity to notify the bank about them when he called to notify he was going to travel outside the country.
Nonetheless, this Court has to stress the fact that the Plaintiff executed the required written notice, in accordance to § 1666(a). In said notice, the Plaintiff "indicate[d his] belief that the statement contain[ed] a billing error and the amount of such billing error, and [he also] set... forth the reasons for [his] belief (to the extent applicable) that the statement contain[ed] a billing error" (Docket No. 1 at 3-4). Nevertheless, as this Court stated above, the applicable law defines billing error as the "reflection on or with a periodic statement of an extension of credit that is not made to the consumer or to a person who has actual, implied, or apparent authority to use the consumer's credit card ." Here, the issue is that the Plaintiff hand-delivered this notice after his trip to Mexico and the charges occurred before the Plaintiff's vacations to Mexico. Therefore, § 1643 protection does not apply to instant case because the use of this credit card was authorized.
In regards to the Plaintiff's approach towards the fact that before his trip to Mexico he indicated to Banco Popular that only the payments made from Mexico were to be authorized, the Court does not find reasonable to ask of a Puerto Rican bank to permit only the transactions made from a foreign country. In Towers World Airways , the court understood that "it is totally unrealistic to burden the card issuer with the obligation to convey to numerous merchants whatever limitations the cardholder has placed on the card user's authority." Towers World Airways, 933 F.2d at 179.
This Court wishes to distinguish that the Plaintiff with some due diligence hand-delivered the written notice within the period of time that is established by law, in which he informed Banco Popular of the "unauthorized use" of his card, and has responsibly paid the debt that Colondres has incurred him in. See Permobil, Inc. v. Am. Express Travel Related Servs. Co, 571 F.Supp.2d 825 (M.D. Tenn. 2008). However, "[n]othing in the TILA suggests that Congress intended to sanction intentional or negligent conduct by the cardholder that furthers the fraud or theft of an unauthorized card user." Minskoff, 98 F.3d at 709. See also Martin, 361 So.2d at 601 ("Were we to adopt any other view, we would provide the unscrupulous and dishonest cardholder with the means to defraud the card issuer by allowing his or her friends to use the card, run up hundreds of dollars in charges and then limit his or her liability to $50 by notifying the card issuer."). Hence, the notice as to "unauthorized use" was in reality provided to the bank after the $30,000 had been charged to Plaintiff's credit card.
IV. CONCLUSION
Recapitulating, this Court finds that for the first transactions mounting up to $12,000 the Plaintiff gave actual authority to Colondres, regardless of the fact that the co-defendant exceeded the agreed amount to be charged up. In regards to the additional charges, which ascended to *289 approximately $30,000, the Court finds that Colondres had apparent authority because the Plaintiff knew of the alleged "unauthorized" transactions since June 2016 but he proceeded to cancel his card at the end of July when it was too late as all the billings were already in transit. In other words, the Plaintiff knew of the alleged "unauthorized use" since a month before he notified Banco Popular.
In conclusion, there is no basis in law to deny Banco Popular's Motion to Dismiss for the reasons stated above. Even though the Plaintiff was diligent by hand-delivering the written notice to Banco Popular, he was not diligent enough when he decided to not inform Banco Popular of the alleged "unauthorized use" before his vacations to Mexico when he had the opportunity to do so during his phone calls with Banco Popular. For the reasons discussed above, this Court grants co-Defendant's Motion to Dismiss (Docket No. 14).
Nonetheless, the Court will refrain from issuing a partial judgment at this time. The First Circuit strongly disfavors partial judgments as they foster piecemeal appeals. Nichols v. Cadle Co., 101 F.3d 1448, 1449 (1st Cir. 1996) ("[P]iecemeal appellate review invites mischief. [T]he practice poses a host of potential problems[;] we have warned, time and again, that Rule 54(b) should be used sparingly."); Zayas-Green v. Casaine, 906 F.2d 18, 21 (1st Cir. 1990) ("This final judgment rule ... furthers 'the strong congressional policy against piecemeal review.' " Id. (quoting In re Continental Investment Corp., 637 F.2d 1, 3 (1st Cir. 1980) ); Comite Pro Rescate De La Salud v. Puerto Rico Aqueduct and Sewer Authority, 888 F.2d 180, 183 (1st Cir. 1989) ; Consolidated Rail Corp v. Fore River Ry. Co., 861 F.2d 322, 325 (1st Cir. 1988) ; Spiegel v. Trustees of Tufts Coll., 843 F.2d 38, 43 (1st Cir. 1988) ; Santa Maria v. Owens-Ill., Inc., 808 F.2d 848, 854 (1st Cir. 1986) ). See also United States v. Nixon, 418 U.S. 683, 690, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).
Due to the aforementioned reasons, Defendant Banco Popular's Motion to Dismiss the Complaint Pursuant to Fed.R.Civ.P. 12(b)(6) (Docket No. 14) is GRANTED .
IT IS SO ORDERED.
In San Juan, Puerto Rico, this 8th day of May, 2018.